**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RAVI SINHA, derivatively on behalf of AGILON HEALTH, INC., | |
| Plaintiff, | Case No.: 1:26-cv-00846 |
| vs. | |
| STEVEN J. SELL, JEFFREY SCHWANEKE, SILVANA BATTAGLIA, SHARAD MANSUKANI, DIANA L. MCKENZIE, KAREN MCLOUGHLIN, RAVI SACHDEV, RONALD A. WILLIAMS, and WILLIAM WULF, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| AGILON HEALTH, INC., | |
| Nominal Defendant. | |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

<u>**INTRODUCTION**</u>

Plaintiff Ravi Sinha ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Agilon Health, Inc. ("Agilon" or the "Company"), files this Verified Shareholder Derivative Complaint against Steven J. Sell ("Sell"), Jeffrey Schwaneke ("Schwaneke"), Silvana Battaglia ("Battaglia"), Sharad Mansukani ("Mansukani"), Diana L. McKenzie ("McKenzie"), Karen McLoughlin ("McLoughlin"), Ravi Sachdev ("Sachdev"), Ronald A. Williams ("Williams"), and William Wulf ("Wulf") (collectively, the "Individual Defendants," and together with Agilon, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Agilon, unjust enrichment, abuse of control, gross mismanagement,

1

waste of corporate assets, for violations of Sections 14(a) of Securities Exchange Act of 1934 (the "Exchange Act"), as well as for contribution under Sections 10(b) and 21D of the Exchange Act against Defendants Sell and Schwaneke. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Agilon, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Agilon's directors and officers from February 26, 2025 through August 4, 2025, inclusive (the "Relevant Period").

2.      Agilon is an Ohio-based Delaware Corporation chiefly engaged in the healthcare industry. The Company seeks to connect primary care physicians ("PCPs") with senior healthcare patients for long-term relationships. As such, the Company is committed to the creation of a Medicare-centric business model.

3.      More specifically, the Company's operations center around the development and expansion of: (1) its healthcare platform (the "Agilon Platform"); (2) the Company's long-term physician partnership approach; and (3) the Company's network (the "Agilon Network").

4.      In addition to streamlining the process of joining PCPs and patients, the Company also seeks to streamline billings. As such, the Company is committed to improving the experiences of both patients and healthcare providers.

5.      The Company's model operates through the formation of risk-bearing entities ("RBEs") throughout various geographic locations. Such RBEs then engage in arrangements with payors who provide monthly payments for the management of the Agilon Network's healthcare providers' patients in the given location.

6.      During the Relevant Period, the Company dramatically overstated its financial guidance and the effects its previous strategic actions would have on improving its financial results. For example, on May 5, 2025, the Company hosted an earnings call to discuss its financial results for the first quarter of 2025 with investors and analysts (the "Q1 2025 Earnings Call"). During the Q1 2025 Earnings Call, Defendant Sell asserted that Agilon remained "***on track to deliver in line with our full year 2025 guidance***."[1]

7.      The truth emerged on August 4, 2025, when the Company issued a press release to announce the departure of Defendant Sell from his role in the Company as President, CEO and a Company director (the "Transition Press Release"). That same day, the Company issued a separate press release to announce disappointing financial results for the second quarter of 2025 (the "Q2 2025 Press Release"). The Q2 2025 Press Release noted, *inter alia*, that the Company was suspending its previously issued guidance for the full-year 2025.

8.      Also on August 4, 2025, the Company hosted an earnings call to discuss its financial results for the second quarter of 2025 with investors and analysts (the "Q2 2025 Earnings

---

[1] Unless otherwise stated, all emphasis herein is added.

Call"). During the Q2 2025 Earnings Call, Defendant Williams stated, in relevant part, that the Company's "*execution was not adequate* [, which] resulted in the underperformance we reported."

9.      On this news, the price of the Company's stock fell roughly $0.93, or approximately 51.5%, from a price per share of approximately $1.82 per share at the close of trading on August 4, 2025, to close at $0.88 per share on August 5, 2025.

10.     Throughout the Relevant Period, the Defendants made materially false and misleading statements and failed to disclose material adverse facts about Agilon's business, operations, and prospects. In particular, the Individual Defendants failed to disclose to shareholders and investors that: (1) the ability of the strategic actions to improve the Company's financial prospects was drastically overstated; (2) cost and risk controls implemented in 2024 would not begin to show a positive impact until 2026; (3) as a result of the foregoing, the Company's full year 2025 guidance was overstated and would not be achieved; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

11.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

12.     In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by failing to maintain adequate internal controls while Defendants Sell and Schwaneke engaged in improper insider sales, netting total proceeds of *approximately $363,676*.

13.     In light of the Individual Defendants' misconduct—which has subjected the Company, its former President and Chief Executive Officer ("CEO"), and its Chief Financial

Officer ("CFO") to a federal securities fraud class action lawsuits pending in the United States District Court for the Eastern District of New York (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

14.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the officers' and directors' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. §78u-4(f)), and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.    Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

19.    Plaintiff is a current shareholder of Agilon. Plaintiff has continuously held shares of Agilon common stock at all relevant times.

### Nominal Defendant Agilon

20.    Agilon is a Delaware corporation with principal executive offices at 440 Polaris Parkway, Suite 550, Westerville, Ohio 43082. Agilon common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "AGL."

### Defendant Sell

21.    Defendant Sell served as the Company's President, CEO, and as a Company director from 2020 to July 29, 2025.

22.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Sell made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|------|------------------|-----------------------|--------------|
| March 14, 2025 | 15,563 | $4.05 | $63,030 |

| April 14, 2025 | 7,898  | $5.60 | $44,229  |
| April 15, 2025 | 22,563 | $5.53 | $124,773 |

Thus, in total, before the fraud was exposed, Defendant Sell sold 46,024 shares of Company stock on inside information, for which he received approximately $232,032 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

23.     The Schedule 14A filed by the Company with the SEC on April 17, 2025 (the "2025 Proxy Statement") stated the following about Defendant Sell:

> **Steven J. Sell** has served as our Chief Executive Officer and President and director since 2020. Mr. Sell also serves as an advisor to several early-stage healthcare companies. Mr. Sell served as President, Chief Executive Officer and Chairman of Health Net, Inc., an insurance provider, from 2016 to 2019 and President, Western Region of Health Net, Inc. from 2008 to 2016. Mr. Sell received his B.A. from Swarthmore College and his M.B.A. from the Stanford Graduate School of Business.
>
> **We believe Mr. Sell is a valuable member of our board because of his experience in the healthcare industry and as agilon health's Chief Executive Officer and President.**

(Emphasis in original).

**Defendant Schwaneke**

24.     Defendant Schwaneke has served as the Company's CFO since July 2024. Defendant Schwaneke previously served as a Company director from 2022 to 2024.

25.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Schwaneke made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share | Proceeds ($) |
| --- | --- | --- | --- |

| | | ($) | |
|---|---|---|---|
| May 28, 2025 | 9,331 | $2.35 | $21,928 |
| July 1, 2025 | 46,099 | $2.38 | $109,716 |

Thus, in total, before the fraud was exposed, Defendant Schwaneke sold 55,430 shares of Company stock on inside information, for which he received $131,643 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

26.    The 2025 Proxy Statement states the following about Defendant Schwaneke:

**Jeffrey Schwaneke** has served as our Chief Financial Officer since July 2024. Previously, Mr. Schwaneke served as a member of our board of directors from 2022 to 2024. Mr. Schwaneke served as the Executive Vice President of Health Care Enterprises for Centene Corporation, a managed health care company, from June to September 2021, and as Executive Vice President, Chief Financial Officer and Treasurer from March 2016 to May 2021. Mr. Schwaneke joined Centene Corporation in July 2008 as Senior Vice President, Corporate Controller and Chief Accounting Officer. Prior to joining Centene Corporation, Mr. Schwaneke served as the Assistant Controller and then as Chief Accounting Officer of Novelis, Inc., a rolled aluminum manufacturing company, from 2006 through 2008.

**Mr. Schwaneke received a B.S. in Accounting from the University of Missouri and is a CPA.**

(Emphasis in original).

**Defendant Battaglia**

27.    Defendant Battaglia has served as a Company director since 2023. Defendant Battaglia currently serves as a member of the Compensation and Human Capital Committee.

28.    The 2025 Proxy Statement states the following about Defendant Battaglia:

**Silvana Battaglia** has served as a director since 2023. Ms. Battaglia is Executive Vice President and Chief Human Resources Officer for Cencora, Inc. (formerly AmerisourceBergen), a leading global healthcare solutions company. Prior to being named to her current role, Ms. Battaglia served as Senior Vice President of Global Compensation, Benefits and Labor Relations and Senior Vice President of Global

Human Resources at Aramark, Inc., a provider of managed services to business, educational, healthcare, governmental and other institutions, from 2011 to 2019. Ms. Battaglia served as the Chief Human Resources Officer of Day & Zimmermann, Inc., a global manufacturing company, from 2008 to 2011 and held increasingly responsible leadership positions with Merck & Co., Inc., a global biopharmaceutical company, from 1998 to 2008. Her early career included positions at Wyeth Pharmaceuticals, Inc., a pharmaceutical company, and Colorcon, a division of Berwind Pharmaceuticals. Ms. Battaglia, a National Association of Corporate Directors certified professional director, received her B.A. from Temple University and her M.S. from Widener University. She has also served as an adjunct faculty member at St. Joseph's University in Philadelphia.

**We believe Ms. Battaglia is a valuable member of our board because of her extensive business leadership experience with global human resources organizations in the healthcare industry, including shaping high-performance cultures, talent and succession management and driving organization transformation within the pharmaceutical and business services sectors, and with global healthcare and pharmaceutical companies.**

(Emphasis in original).

### Defendant Mansukani

29.    Defendant Mansukani has served as a Company director since 2017. Defendant Mansukani also currently serves as the Chair of the Nominating & Governance Committee and as a member of the Compliance and Quality Committee.

30.    The 2025 Proxy Statement states the following about Defendant Mansukani:

**Sharad Mansukani, M.D.** has served as a director since 2017. Dr. Mansukani has served as a Senior Advisor to TPG, a private equity firm, since 2005, a member of the board of directors of Monogram Health, Inc. since 2021, and Chairman of the board of directors of Convey Health Solutions since 2019. He also serves as a member of The Wharton School Healthcare Policy Board and as a trustee of the Children's Hospital of Philadelphia. Dr. Mansukani served as Chairman of the board of directors of Envision Rx Options from 2013 to 2016; a strategic advisor to the board of directors at Cigna Corp. from 2012 to 2015; Vice Chairman, board of directors of Health Spring, Inc. from 2007 to 2012; a director of IMS Health Holdings, Inc. from 2009 to 2016; a director of Surgical Care Affiliates, Inc. from 2007 to 2017; lead director of IASIS Healthcare from 2005 to 2018; and a director of Kindred Healthcare, Inc. from 2015 to 2018. Dr. Mansukani also has served as a Senior Advisor on Medicare's Program Advisory and Oversight Committee to the Secretary of the Department of Health and Human Services; Senior Advisor to the Administrator of the Centers for Medicare and Medicaid Services; and Senior Vice

President and Chief Medical Officer at Health Partners. Dr. Mansukani completed a residency and fellowship in ophthalmology at the University of Pennsylvania School of Medicine and a fellowship in quality management and managed care at the Wharton School of the University of Pennsylvania. He is a graduate of the Managed Care Executive Program at the Kellogg School of Business.

**We believe Dr. Mansukani is a valuable member of our board because of his experience as a medical professional, including in his positions working for government agencies, and his experience as a member of, or as an advisor to, other healthcare companies' boards.**

(Emphasis in original).

### Defendant McKenzie

31.     Defendant McKenzie has served as a Company director since 2023. Defendant McKenzie currently serves as the Chair of the Compensation and Human Capital Committee and as member of the Audit Committee.

32.     The 2025 Proxy Statement states the following about Defendant McKenzie:

**Diana L. McKenzie** has served as a director since 2023. Ms. McKenzie has been the owner of and a consultant with DLM Horizons, LLC, a consulting company, since 2020 and has served as an advisor to BrightInsight, Inc., a provider of digital health platforms for biopharma and medical device companies since 2020. Ms. McKenzie has also served as a senior advisor to Bright Park Capital, an investment firm specializing in software, information services, technology-enabled business services and healthcare since 2019. Ms. McKenzie previously served as Workday Inc.'s, a provider of enterprise cloud applications, first Chief Information Officer from 2016 to 2019. Before Workday, Inc, Ms. McKenzie served in multiple technology leadership roles at Amgen, Inc., a biopharmaceutical company, from 2004 to 2016, including the role of Chief Information Officer. Prior to joining Amgen, Inc., she served in various technology leadership roles from 1987 to 2004 at Eli Lilly and Company, a pharmaceutical company. Ms. McKenzie serves as a director and as a member of the audit, compensation, and finance and risk committees of MetLife, Inc., serves as a director of Vertex Pharmaceuticals Incorporated, and Paradox, and serves as a Special Advisor to Brighton Park Capital and Red Cell Partners. Ms. McKenzie previously served on the board of Change Healthcare Inc. from 2019 to 2022.She received her B.S. from Purdue University.

**We believe Ms. McKenzie is a valuable member of our board because of her leadership and technology experience and her experience on other healthcare companies' boards. Additionally, Ms. McKenzie brings to the board over 30**

**years of leadership experience gained from growing, scaling, and transforming global businesses in the life sciences and software industries with revenues ranging from $3 billion to $20 billion.**

(Emphasis in original).

### Defendant McLoughlin

33.     Defendant McLoughlin has served as a Company director since 2021. Defendant McLoughlin also currently serves as the Chair of the Audit Committee, as a member of the Compensation and Human Capital Committee, and as a member of the Nominating & Governance Committee.

34.     The 2025 Proxy Statement states the following about Defendant McLoughlin:

**Karen McLoughlin** has served as a director since 2021. Ms. McLoughlin has served as a Senior Advisor to McKinsey & Co., a global management consultancy firm, since 2022. In addition, Ms. McLoughlin has served as a director and member of the audit committee for Nexthink since 2024. Previously, Ms. McLoughlin was the Chief Financial Officer of Cognizant Technology Solutions Corporation, a leading provider of information technology, business process and consulting services, from 2012 to 2020. Prior to joining Cognizant Technology Solutions in 2003, Ms. McLoughlin served in financial roles for Spherion Corp. (now SFN Group Inc.), a provider of temporary and permanent staffing solutions to businesses, from 1997 to 2003, Ryder Systems, Inc. from 1994 to 1997, and Price Waterhouse (now PricewaterhouseCoopers), an accounting firm, from 1988 to 1994. Ms. McLoughlin serves on the board of directors of Best Buy Co., Inc. as a member of the audit committee and chair of the finance and investment policy committee. Ms. McLoughlin received her B.A. from Wellesley College and her M.B.A. from Columbia University.

**We believe Ms. McLoughlin is a valuable member of our board because of her experience as an executive at a large public company and as a public company director, as well as her financial and accounting expertise.**

(Emphasis in original).

### Defendant Sachdev

35.     Defendant Sachdev has served as a Company director since 2017. Defendant Sachdev also currently serves as a member of the Compliance and Quality Committee.

36.     The 2025 Proxy Statement states the following about Defendant Sachdev:

**Ravi Sachdev** has served as a director since 2017 and as Vice Chairman since 2021. Mr. Sachdev has served as a Partner of CD&R since 2015, focusing on the healthcare sector. Mr. Sachdev also serves as a director and member of the audit and nominating/corporate governance committee of Steve Madden, Inc., and as a director of Millennium Physician Group, apree health and Gentiva Health Services. From 2010 to 2015, Mr. Sachdev was a Managing Director and Co-Head of Healthcare Services at J.P. Morgan Chase & Co., a global financial services firm, from 2009 to 2010 he served as Managing Director at Deutsche Bank Securities, Inc., a subsidiary of global investment bank and financial services firm Deutsche Bank AG, and from 1998 to 2006 he served as Vice President at Peter J. Solomon Company, an investment banking boutique, specializing in mergers and acquisitions in the healthcare sector. Mr. Sachdev received his B.A. from the University of Michigan.

**We believe Mr. Sachdev is a valuable member of our board because of his extensive experience with our business, the healthcare industry generally and capital markets.**

(Emphasis in original).

### **Defendant Williams**

37.     Defendant Williams is the Company's co-founder, and has served as the Executive Chairman of the Board since July 29, 2025. Previously, Defendant Williams served as the non-executive Chairman of the Board from 2017 to July 29, 2025.

38.     The 2025 Proxy Statement states the following about Defendant Williams:

**Ron Williams** is a co-founder of our Company and has served as a director and chairman of the board since 2017. Mr. Williams also is Chairman and Chief Executive Officer of RW2 Enterprises, through which he counsels C-Suite corporate executives, and serves as an operating advisor to Clayton Dubilier & Rice LLC, a private equity firm ("CD&R") Mr. Williams served as the Chief Executive Officer and Chairman of Aetna Inc., a diversified healthcare benefits company, from 2006 to 2010 and 2011, respectively. Mr. Williams serves on the board of directors and on the audit committee of Warby Parker Inc. and served on the board of directors of The Boeing Company from 2010 to 2024, The American Express Company from January 2007 to April 2022, Johnson & Johnson from June 2011 to April 2022 and Envision Healthcare from 2011 to 2017. Mr. Williams also serves as Chairman of The Conference Board and the Peterson Institute for International Economics and served as a director of NAF and on the boards of private companies apree health (previously Castlight/Vera Whole Health Inc.) and Millennium Physician Group. Mr. Williams received his B.A. from Roosevelt University and his M.S. from MIT Sloan School of Management.

**We believe Mr. Williams is a valuable member of our board because of his experience as an executive at a large healthcare company and because of his experience serving as a member of other healthcare companies' boards.**

(Emphasis in original).

**Defendant Wulf**

39.     Defendant Wulf has served as a Company director since 2017. Defendant Wulf also currently serves as the Chair of the Compliance and Quality Committee, as a member of the Audit Committee, and as a member of the Nominating & Governance Committee.

40.     The 2025 Proxy Statement states the following about Defendant Wulf:

**William Wulf, M.D.** has served as a director since 2017. Dr. Wulf was formerly the Chief Executive Officer of Central Ohio Primary Care Physicians, Inc., a primary care provider, ("COPC") from 2013 until 2022. Dr. Wulf was a founding partner of COPC in 1996 and assumed the role of Chief Executive Officer in 2013 after 25 years as a practicing Internist and COPC Corporate Medical Director. Dr. Wulf has also served as an advisor for multiple payors including Anthem Blue Cross and Blue Shield, Aetna Inc. and United Healthcare. Dr. Wulf has served as board chair of America's Physician Groups and is a director for apree health. Dr. Wulf received his B.S. from The Ohio State University and his M.D. from the Medical College of Ohio.

**We believe Dr. Wulf is a valuable member of our board because of his experience as a medical professional, including as an executive at a medical group, and because of his experience as an advisor for multiple payors.**

(Emphasis in original).

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

41.     By reason of their positions as officers, directors, and/or fiduciaries of Agilon and because of their ability to control the business and corporate affairs of Agilon, the Individual Defendants owed Agilon and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Agilon in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to

act in furtherance of the best interests of Agilon and its shareholders so as to benefit all shareholders equally.

42.    Each director and officer of the Company owes to Agilon and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

43.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Agilon, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

44.    To discharge their duties, the officers and directors of Agilon were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

45.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Agilon, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Agilon's Board at all relevant times.

46.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

47.     To discharge their duties, the officers and directors of Agilon were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Agilon were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Ohio, and the United States, and pursuant to Agilon's own Compliance Code of Conduct (the "Code of Conduct").

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Agilon conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make

reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Agilon and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Agilon's operations would comply with all applicable laws and Agilon's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

48.     Each of the Individual Defendants further owed to Agilon and the shareholders the duty of loyalty requiring that each favor Agilon's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

49.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Agilon and were at all times acting within the course and scope of such agency.

50.     Because of their advisory, executive, managerial, directorial, and controlling positions with Agilon, each of the Individual Defendants had access to adverse, non-public information about the Company.

51.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Agilon.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

52.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

53.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

54.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and

individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Agilon was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

55.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

56.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Agilon and was at all times acting within the course and scope of such agency.

## AGILON'S CODE OF CONDUCT

57.     Agilon's Code of Conduct states that its purpose is "to ensure all Work-force Members are aware of and understand the laws, rules, and regulations that guide agilon." Moreover, the Code of Conduct states that it "lays out the standards of conduct and procedures that all directors, officers, employees, and contracted workers of agilon health are required to follow[.]"

58.     In a section titled "Obligation to Create and Maintain an Ethical Workplace," under the subsection "Comply with All Legal and Ethical Requirements," the Code of Conduct states the following:

> Understand and follow the laws, rules, and regulations that govern agilon's business, including insider trading laws that prohibit the use of material, non-public

information when trading in or recommending Company securities[3]. Further, if you have material, non-public information, you may not communicate such information to third parties ("Tipping"). These restrictions also apply to securities of other companies if you learn of material, non-public information during your work for agilon. In addition to violating Company policy, such activities are illegal. Please refer to our Insider Trading Policy for more information.

59.    In the same section, under the subsection "Conflict of Interest," the Code of

Conduct states the following:

A conflict of interest occurs when your personal interests could compromise, or appear to compromise, your judgment, decisions, or actions in the workplace. Conflicts of interest also occur when you, or a member of your family, receive improper personal benefits because of your position in the Company. You should not engage in any activity during your relationship with agilon that could conflict or appear to conflict with the best interests of the Company.

You have a responsibility to inform the Compliance Department of any transaction or relationship that you feel could result in an actual, potential, or perceived conflict of interest. This information must be provided upon hire, annually during compliance training, as potential conflicts arise, and as the nature of previously disclosed conflicts change.

60.    In the same section, under the subsection "Retention of Records," the Code of

Conduct states the following:

We are committed to keeping complete and accurate records in compliance with sound business practices and applicable laws and regulations. All Workforce Members must retain records in accordance with agilon's Data Retention and Disposition Policy and must seek guidance from Legal or Compliance when unsure of how to retain records.

61.    In a section titled "Standards Relating To Business Practices," under the subsection

"Business Transactions," the Code of Conduct states the following:

During our day-to-day operations, you may deal with a variety of individuals, companies, organizations, and government agencies. In those dealings, you must never make any misrepresentations, dishonest statements, or statements meant to mislead or to misinform. In addition, you should not take advantage of anyone by manipulating, hiding, abusing privileged information, misrepresenting material factors, or any other unfair practice. If it appears that anything you have said has been misunderstood, you need to inform your supervisor to determine how best to correct it.

62.     In a section titled "Responding To Improper Conduct," the Code of Conduct states

the following:

> This Code of Conduct will be enforced consistently, without regard to your position
> with agilon health. If you violate this Code of Conduct, you may face disciplinary
> action. The supervisor of a disciplined individual may also face disciplinary action
> for their failure to properly oversee conduct or for retaliation against anyone who
> reports a violation.
>
> Our response to misconduct will depend on many things, including if the improper
> behavior involved illegal conduct. Disciplinary action may include but is not
> limited to reprimands and warnings, probation, suspension, demotion,
> reassignment, reduction in salary, or immediate termination. You should be aware
> that specific actions and omissions are prohibited by the Code of Conduct and might
> be crimes that could lead to individual criminal prosecution, including fines and
> imprisonment.

63.     In a section titled "Investigations," the Code of Conduct states the following, in

relevant part:

> The Compliance Department maintains and oversees the Compliance Hotline and
> other methods for reporting potential compliance issues. The staff responsible for
> supervising these reporting tools will submit all reports or complaints received to
> the Chief Compliance Officer, who will work with other departments, including
> Legal, as needed.
>
> Any reports received relating to our financial statements, accounting, internal
> controls, or auditing matters will be reviewed in conjunction with Finance. No
> person who is the subject of a complaint will receive such a notification.
>
> Upon receiving any complaints relating to other matters covered by this Code of
> Conduct, Compliance will work with Legal and Human Resources, as applicable,
> to conduct an initial investigation to determine if further action is needed to resolve
> the complaint, and will maintain a log of all complaints received, tracking their
> receipt, investigation, and resolution.

64.     In a section titled "Waivers," the Code of Conduct states the following:

> Waivers or exceptions to the Code of Conduct will be granted only in advance and
> under exceptional circumstances. A waiver of the Code of Conduct for any
> executive officer or director may be made only by the Board of Directors of agilon
> health or a committee of the Board of Directors. It must be disclosed to shareholders
> as may be required by applicable law and exchange requirements.

65.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## AGILON'S AUDIT COMMITTEE CHARTER

66.     The Company also maintains a "Charter of the Audit Committee of the Board of Directors" (the "Audit Committee Charter"). Under a section titled "Purpose," the Audit Committee Charter states the following:

> The Committee assists the Board in overseeing: (a) the integrity of the Corporation's financial statements and disclosures; (b) the qualifications, independence, and performance of the independent auditor; (c) the internal audit function; (d) accounting, financial reporting, and related compliance; (e) financial risk, internal controls, and cybersecurity risk as each relates to financial reporting and disclosure controls; and (f) preparation of the Committee report required by the rules of the U.S. Securities and Exchange Commission (the "SEC").

67.     Under a section titled "Responsibilities," in a subsection titled "Financial Reporting and Disclosure Matters," the Audit Committee Charter states that the Audit Committee will:

> Meet to review and discuss the Corporation's annual financial statements and quarterly financial statements with management and the independent auditor, including the Corporation's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the results of the independent auditor's audit of the annual financial statements and reviews of the quarterly financial statements, including any difficulties encountered or significant disagreements with management and management's responses to such matters. This review shall specifically include consideration of the use of "pro forma" or

"adjusted" non-GAAP information and earnings guidance provided to analysts and rating agencies.

68.    In the same section and subsection, the Audit Committee Charter states that the

Audit Committee will:

Review and discuss with management and the independent auditor:

(i) prior to the annual audit, the scope, staffing, locations, reliance upon management, internal audit and general audit approach and the scope of all audit-related services, for the current year and the following year;

(ii) significant issues regarding accounting and auditing principles and practices and financial statement presentations, including all critical accounting policies and estimates, any significant changes in the Corporation's selection or application of accounting principles and any significant issues as to the adequacy of the Corporation's internal controls and any special audit steps adopted in light of significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting;

(iii) analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including, where applicable, analyses of the effects of alternative GAAP methods on the financial statements;

(iv) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements;

(v) any material written communications between the independent auditor and management, including management letters and schedule of unadjusted audit differences;

(vi) any significant changes to the Corporation's auditing and accounting principles and practices suggested by the independent auditor, internal audit personnel or management; and

(vii) management's internal control report prepared in accordance with rules promulgated by the SEC pursuant to Section 404 of the Sarbanes-Oxley Act, as amended, and Item 308 of Regulation S-K.

69.    In the same section and subsection, the Audit Committee Charter states that the

Audit Committee will "[r]ecommend to the Board whether the annual audit financial statements

should be included in the Corporation's Annual Report on Form 10-K."

70.     In the same section and subsection, the Audit Committee Charter states that the Audit Committee will "[p]repare, review, and approve the report of the Committee required by the SEC to be included in the Corporation's annual proxy statement."

71.     In the same section and subsection, the Audit Committee Charter states that the Audit Committee will:

> Review and discuss with management the Corporation's practices regarding earnings press releases and the provision of financial information and earnings guidance by management to analysts and ratings agencies. The Committee's discussion in this regard may be general in nature (i.e., discussion of the types of information to be disclosed and the type of presentation to be made).

72.     In the same section and subsection, the Audit Committee Charter states that the Audit Committee will:

> Review and discuss with the Corporation's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") the procedures undertaken in connection with the CEO and CFO certifications for the Corporation's Annual Reports on Form 10-K and Quarterly Reports on Form 10- Q, including their evaluation of the Corporation's disclosure controls and procedures and internal controls.

73.     In a section titled "Internal Audit, Compliance Matters and Other," the Audit Committee Charter states that the Audit Committee will:

> Review the appointment and termination of the Corporation's head of internal audit, and review the charter, audit plans, deviations from plan, activities, budget, staffing and organizational structure of the internal audit function and all significant reports to management prepared by internal audit personnel, and management's responses, actions and outstanding recommendations or restrictions on work or access to required information.  Review at least annually internal audit compliance with the Institue [sic] of Internal Auditors standards for Professional Practice Framework.

74.     In the same section, the Audit Committee Charter states that the Audit Committee will:

> Establish and maintain procedures for:

(i) the receipt, retention, and treatment of complaints received by the Corporation regarding accounting, internal accounting controls, or auditing matters; and

(ii) the confidential, anonymous submission by employees of the Corporation of concerns regarding questionable accounting or auditing matters.

75.    In the same section, the Audit Committee Charter states that the Audit Committee will "[r]eview reports of any significant whistleblower incidents, fraud investigations, and ethics program trends, and oversee management's corrective actions."

76.    In the same section, the Audit Committee Charter states that the Audit Committee will:

Review with management and the independent auditor any correspondence with regulators or governmental agencies and any employee complaints or published reports that raise material issues regarding the Corporation's financial statements or accounting policies.

77.    In the same section, the Audit Committee Charter states that the Audit Committee will:

Review with the Corporation's Chief Legal Officer any legal matters that may have a material impact on the financial statements or the compliance policies of the Corporation and its subsidiaries, and any material reports or inquiries received by the Corporation or any of its subsidiaries from regulators or governmental agencies.

78.    In the same section, the Audit Committee Charter states that the Audit Committee will:

Obtain reports from management, the internal auditor and the independent auditor regarding compliance with all applicable legal and regulatory requirements, and inquire of the independent auditor whether any officer or director of the Corporation, or any person acting under their direction, has sought to fraudulently influence, coerce, manipulate or mislead the independent auditor for purposes of rendering the Corporation's financial statements materially misleading.

79.    In a section titled "Risk Oversight," the Audit Committee Charter states that the Audit Committee will:

Periodically review and discuss with management the Corporation's guidelines and policies with respect to the framework and process by which the Corporation undertakes risk assessment and the Corporation's enterprise risk management program, including discussion of the Corporation's major financial risk exposures and the steps management has taken to identify, assess and monitor such exposures. Such risks and management thereof, include, but are not limited to, threatened and pending litigation, claims against the Corporation or any of its subsidiaries, cybersecurity risks, key business risks, any claims by any regulatory or governmental authorities, review of the Corporation's insurance programs, and matters that could materially impact the Corporation's internal control over financial reporting.

80.     In the same section, the Audit Committee Charter states that the Audit Committee will:

Have primary oversight responsibility for cybersecurity, data privacy, and artificial intelligence risks, including their potential impact on the Corporation's financial statements, internal control over financial reporting, and disclosure controls and procedures.

81.     In a section titled "Reports to Board; Review of Committee Performance and Charter," the Audit Committee Charter states that the Audit Committee will:

Maintain minutes or other records of its meetings and report regularly to the Board and review with the Board any issues that arise with respect to:

(i) the quality or integrity of the Corporation's financial statements;

(ii) the performance and independence of the Corporation's independent auditor;

(iii) the execution of the Corporation's internal audit function; and

(iv) the Corporation's compliance with legal and regulatory requirements as such requirements pertain to the accounting, financial and external reporting policies and practices of the Corporation.

82.     In violation of the Audit Committee Charter, Defendants McLoughlin (as chair), McKenzie, and Wulf failed to adequately review and discuss the Company's quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions;

and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### *Relevant Background*

83.     Agilon is a Delaware Corporation headquartered in Westerville, Ohio, chiefly engaged in the healthcare industry. More specifically, the Company's operations center around the development and expansion of: (1) the Agilon Platform; (2) the Company's long-term physician partnership approach; and (3) the Agilon Network.

84.     The Agilon Platform seeks to streamline the process of connecting PCPs with patients as well in addition to streamlining billings. The Agilon Platform also purportedly allows PCPs to discover unknown opportunities, note gaps in patient care, and overall support their practices.

85.     The Agilon Platform is also intended to support the transition of healthcare patients and providers to the "Total Care Model" (the "Total Care Model"). The Total Care Model is a variant of value-based care reimbursement structures in which the Company, through its RBEs, is responsible for managing the medical costs derived from Agilon members.

86.     In conjunction with the Total Care Model, the Agilon Platform features a long-term physician partner model (the "Long-Term Model"), intended to maintain provider-patient relationships for typically twenty years. Under the Long-Term Model, health plan payors contract with the Company to cover physician partners' Medicare Advantage patients through per-member per-month ("PMPM") agreements.

87.     The Agilon Network is intended to enhance collaboration between healthcare providers, and to refine healthcare practices. Moreover, the Agilon Network is intended to help PCPs influence further development of the Agilon Platform.

88.     As noted above, the Company's Total Care Model primarily operates through the creation of RBEs throughout various geographic locations which then enter into agreements with payors to cover the healthcare needs of the Company's physician partners' attributed patients. In addition, the RBEs enter into long-term professional services agreements with anchor physicians groups. Anchor physicians groups refer to primary care physician groups, multi-specialty practices, independent practice associations, and hospital physician groups.

89.     As of December 31, 2024, the Company has accumulated 29 anchor physician groups across 30 geographic locations. Moreover, as of December 31, 2024, the Agilon Platform's PCPs provide care for roughly 526,500 Medicare Advantage members.

<u>**False and Misleading Statements**</u>

***February 25, 2025 Press Release***

90.     The Relevant Period began on February 25, 2025, after the market closed, when the Company issued a press release to announce its financial results for the fourth quarter and full-year 2024 (the "Q4 2024 Press Release").

91.     The Q4 2024 Press Release stated that the Company's "[f]ull year ***2025 guidance reflects the positive impact from strategic actions*** and assumes continued elevated medical cost trends; Class of 2025 expected to add approximately 20,000 Medicare Advantage members."

92.     In addition, the Q4 2024 Press Release provided the following guidance for the 2025:

• Respective low and high ends of 490,000 or 520,000 Medicare Advantage Members;

• Respective low and high ends of 105,000 and 115,000 ACO Model Members;

• Respective low and high ends of 595,000 or 635,000 Total Members Live on Platform;

• Respective low and high ends of 489,000 and 516,000 Avg. Medicare Advantage Members;

• Total Revenues of (in millions) $5,825 to $6,025

• Medical Margin (in millions) of $275 to $325.

• Adjusted EBITDA (in millions) of ($95) to ($55)

93.    The Q4 2024 Press Release also quoted Defendant Sell as stating the following:

While the underlying strength of our model continues to deliver significant value to patients, payors, and our PCP partners, ***we are still managing through a challenging Medicare Advantage environment. As a result of the strategic actions we have taken to reduce our underwriting risks, improve our platform capabilities, and maintain cost discipline we have established a stronger foundation for success.*** Combined with continued market demand we remain focused on supporting our physician partners to deliver high-quality, cost-effective care to their senior patients while driving long-term sustainable financial performance.

***April 17, 2025 Proxy Statement***

94.    On April 17, 2025, Defendants Sell, Battaglia, Mansukani, McKenzie, McLoughlin, Sachdev, Williams, and Wulf solicited the 2025 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

95.    The 2025 Proxy Statement called for shareholder approval of, *inter alia*: (1) the re-election of Defendants Battaglia and Mansukani to the Board until the 2028 Annual Meeting of the Stockholders; (2) the ratification of the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for the year ending December 31, 2025; and (3) on advisory basis, the compensation paid to the Company's named executive officers.

96.    With respect to the "Risk Oversight," the 2025 Proxy Statement stated:

Our board of directors as a whole has responsibility for overseeing our risk management. The board of directors exercises this oversight responsibility directly and through its committees. The oversight responsibility of the board of directors and its committees is informed by reports from our management team and from our internal audit department that are designed to provide visibility to the board of

directors about the identification and assessment of key short-, intermediate-, and long-term risks and our risk mitigation strategies. The full board of directors has primary responsibility for evaluating strategic and operational risk management, and succession planning. Our Audit Committee has the responsibility for overseeing our major financial and accounting risk exposures and the steps our management has taken to monitor and control these exposures, including policies and procedures for assessing and managing risk. Our Compensation and Human Capital Committee evaluates risks arising from our compensation policies and practices, as more fully described below. Our Compliance and Quality Committee oversees risks arising from our compliance with regulatory and legal requirements including those relating to Medicare, patient confidentiality and privacy, and other healthcare regulatory matters, and it also oversees various enterprise risks. Our Chief Compliance Officer, who reports to our Chief Legal Officer, evaluates and reports findings to the committees and the full board of directors regularly, and no less than quarterly, Our Nominating and Governance Committee reviews risks relating to sustainability and governance issues. The Audit Committee, Compensation and Human Capital Committee, Compliance and Quality Committee and Nominating and Governance Committee provide reports to the full board of directors regarding these matters.

97.    With respect to the "Code of Conduct and Code of Financial Ethics," the 2025 Proxy Statement stated:

We have a Code of Conduct that applies to all of our officers, employees, and directors and a Code of Financial Ethics that applies to our Chief Executive Officer, Chief Financial Officer and corporate officers with financial and accounting responsibilities, including the Chief Accounting Officer and any other person performing similar tasks or functions. The Code of Conduct and the Code of Financial Ethics each address matters such as conflicts of interest, confidentiality, business practices, and compliance with laws and regulations. The Code of Conduct and the Code of Financial Ethics are available without charge at https://investors.agilonhealth.com/governance/governance-documents/default.aspx.

98.    The 2025 Proxy Statement was materially false and misleading because it failed to disclose, *inter alia*, that(1) the ability of the strategic actions to improve the Company's financial prospects was drastically overstated; (2) cost and risk controls implemented in 2024 would not begin to show a positive impact until 2026; (3) as a result of the foregoing, the Company's full year 2025 guidance was overstated and would not be achieved; and (4) the Company failed to

maintain internal controls As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

99.     The 2025 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2025 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

100.     As a result of Defendants Sell, Battaglia, Mansukani, McKenzie, McLoughlin, Sachdev, Williams, and Wulf causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Battaglia and Mansukani to the Board until the 2028 Annual Meeting of the Stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for the year ending December 31, 2025; and (3) on advisory basis, approve the compensation paid to the Company's named executive officers.

### *May 5, 2025 Earnings Call*

101.     On May 5, 2025, the Company hosted the Q1 2025 Earnings Call with investors and analysts to discuss the Company's first quarter results.

102.     During the Q1 2025 Earnings Call, Defendant Sell stated that Agilon remained "***on track to deliver in line with our full year 2025 guidance***."

103.    The statements contained in ¶¶90-93 and ¶102 were materially false and misleading, because they failed to disclose, *inter alia*, (1) the ability of the strategic actions to improve the Company's financial prospects was drastically overstated; (2) cost and risk controls implemented in 2024 would not begin to show a positive impact until 2026; (3) as a result of the foregoing, the Company's full year 2025 guidance was overstated and would not be achieved; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

## **The Truth Emerges**

### *August 4, 2025 Transition Press Release*

104.    The truth emerged on August 4, 2025, when the Company issued the Transition Press Release. The Transition Press Release reported, *inter alia*, that Defendant Sell "has stepped down as President, CEO, and a Director of the Board. Ronald A. Williams, the Company's co-founder and Board Chairman since 2017, has been appointed Executive Chairman. Williams is an industry veteran with leadership experience at healthcare and technology companies including Aetna, where he was Chairman and CEO."

105.    That same day, the Company filed a current report on Form 8-K with the SEC reporting Defendant Sell's departure from Agilon and noting that his "departure was a termination without 'cause' under Mr. Sell's employment agreement[.]"

### *August 4, 2025 Earnings Press Release and Earnings Call*

106.    Also on August 4, 2025, the Company issued the Q2 2025 Press Release. The Q2 2025 Press Release reported lackluster financial metrics, and quoted Defendant Williams as stating the following:

[A]gilon's value-based care model delivers significant value to our physician partners and their senior patients across the U.S. with a proven ability to serve as the long-term solution for practices focused on outcomes[.] We have continued advancing strategic initiatives in 2025 to improve performance – including enhancing our platform, data visibility, quality and delivery programs and contract economics – that we expect to fully realize the benefit of next year given the nature of our business cycle. Nevertheless, as we progressed through this transition year, ***it's become clear that the industry headwinds are more acute than previously expected, and our enhanced data platform is providing visibility that indicates our 2024 and 2025 risk adjustment is also lower than previously expected, which is impacting near-term results.*** It is clear we need to further improve execution and more fully optimize agilon against broader market-based complexities.

107.     Moreover, the Q2 2025 Press Release noted that the Company was suspending its guidance for 2025, stating the following:

In conjunction with the announcement of agilon's leadership change and the evaluation of additional actions to optimize operating performance, as well as continued execution of ongoing initiatives and market uncertainty which may impact future results, agilon ***is suspending its previously issued full-year 2025 financial guidance and related assumptions***.

108.     Also on August 4, 2025, after the market closed, the Company hosted the Q2 2025 Earnings Call.

109.     During the Q2 2025 Earnings Call, Defendant Williams discussed how, in light of the "long-term nature of our business cycle," the Company's performance would not reflect the cost and risk management measures taken in 2024 until 2026, as opposed to in 2025 as the Individual Defendants previously intimated. More specifically, Defendant Williams stated that:

Given the long-term nature of our business cycle, we have not yet captured the full upside from these enhancements this year, ***but are confident in realizing them in 2026***. Nevertheless, as 2025 progressed, the industry complexities and headwinds we believe agilon would face were more acute than previously expected. ***And our execution was not adequate***. This resulted in the underperformance we reported.

110.     Analysts and media outlets were swift to take note of the Company's disclosures. For instance, on August 4, 2025, after the market closed, Investing.com published an article titled

"agilon health stock plunges after CEO steps down amid earnings miss." The Investing.com article stated the following, in relevant part:[2]

> [Agilon stock tumbled] after the company announced CEO Steven Sell has stepped down **and the firm reported disappointing second quarter results that fell short of expectations**.
>
> * * *
>
> The leadership change [as discussed above], **coincided with concerning financial results for the second quarter of 2025. Total revenue decreased 6% to $1.39 billion compared to $1.48 billion in the same period last year**. The company reported a gross loss of $52 million, a significant deterioration from the $32 million profit in Q2 2024.
>
> Medical margin swung to a negative $53 million from a positive $106 million YoY, while adjusted EBITDA loss widened to $83 million compared to a $3 million loss in the prior-year period.
>
> **The company cited several factors for the disappointing performance, including $66 million in prior period development costs and a $48 million reduction in risk adjustment revenue for 2025**. Total membership on the agilon platform decreased to 614,000 as of June 30, 2025, representing a 5% decline from the same period last year.

111.    On this news, the Company's common stock fell roughly $0.93, or approximately 51.5%, from a price per share of approximately $1.82 per share at the close of trading on August 4, 2025 to close at approximately $0.88 per share on August 5, 2025.

## DAMAGES TO AGILON

112.    As a direct and proximate result of the Individual Defendants' conduct, Agilon will lose and expend many millions of dollars.

---

[2] *Agilon health stock plunges after CEO steps down amid earnings miss*, INVESTING.COM (Aug. 4, 2025, 5:26 PM), https://www.investing.com/news/stock-market-news/agilon-health-stock-plunges-after-ceo-steps-down-amid-earnings-miss-93CH-4168984.

113.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

114.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

115.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

116.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company, including lucrative insider trading conducted by two of the Individual Defendants.

117.    As a direct and proximate result of the Individual Defendants' conduct, Agilon has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## **DERIVATIVE ALLEGATIONS**

118.    Plaintiff brings this action derivatively and for the benefit of Agilon to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their

fiduciary duties as directors and/or officers of Agilon, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act.

119.    Agilon is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

120.    Plaintiff is, and has been at all relevant times, a shareholder of Agilon. Plaintiff will adequately and fairly represent the interests of Agilon in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

121.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

122.    A pre-suit demand on the Board of Agilon is futile and, therefore, excused.  At the time of filing of this complaint, the Board consists of the following seven individuals: Defendants Battaglia, Mansukani, McKenzie, McLoughlin, Sachdev, Williams, and Wulf (the "Director Defendants"). Plaintiff needs only to allege demand futility as to four of the seven Directors that were on the Board at the time of the filing of this complaint.

123.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, all of which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

124.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly caused or permitted Agilon to issue materially false and misleading statements. Specifically, the Director Defendants caused Agilon to issue false and misleading statements which were intended to make Agilon appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

125.    Additional reasons that demand on Defendant Battaglia is futile follow. Defendant Battaglia has served as a Company director since 2023. Defendant Battaglia also currently serves as a member of the Compensation and Human Capital Committee. Defendant Battaglia has received and continues to receive compensation for her role as a director. As a trusted Company director, she conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Moreover, Defendant Battaglia solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendant Mansukani and herself to the Board, thereby allowing them to continue breaching their fiduciary duties to Agilon. For these reasons, Defendant Battaglia breached her fiduciary duties, faces a substantial likelihood of liability, is not independent nor disinterested, and thus demand upon her is futile and, therefore, excused.

126.    Additional reasons that demand on Defendant Mansukani is futile follow. Defendant Mansukani has served as a Company director since 2017. Defendant Mansukani also

currently serves as the Chair of the Nominating & Governance Committee and as a member of the Compliance and Quality Committee. Defendant Mansukani has received and continues to receive compensation for his role as a director. As the trusted Company director, he conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Mansukani solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election Defendant Battaglia and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to Agilon. For these reasons, Defendant Mansukani breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

127. Additional reasons that demand on Defendant McKenzie is futile follow. Defendant McKenzie has served as a Company director since 2023. Defendant McKenzie also currently serves as the Chair of the Compensation and Human Capital Committee and as member of the Audit Committee. As a trusted Company director, she conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Moreover, Defendant McKenzie solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Battaglia and Mansukani to the Board, thereby allowing them to continue breaching their fiduciary duties to Agilon. For these reasons, Defendant McKenzie breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

128.    Additional reasons that demand on Defendant McLoughlin is futile follow. Defendant McLoughlin has served as a Company director since 2021. Defendant McLoughlin also currently serves as the Chair of the Audit Committee, as a member of the Compensation and Human Capital Committee, and as a member of the Nominating & Governance Committee. Defendant McLoughlin has received and continues to receive compensation for her role as a director. As a trusted Company director, she conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Moreover, Defendant McLoughlin solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Battaglia and Mansukani to the Board, thereby allowing them to continue breaching their fiduciary duties to Agilon. For these reasons, Defendant McLoughlin breached her fiduciary duties, faces a substantial likelihood of liability, is not independent nor disinterested, and thus demand upon her is futile and, therefore, excused.

129.    Additional reasons that demand on Defendant Sachdev is futile follow. Defendant Sachdev has served as a Company director since 2017. Defendant Sachdev also currently serves as a member of the Compliance and Quality Committee. Defendant Sachdev has received and continues to receive compensation for his role as a director. As a trusted Company director, he conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Sachdev solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Battaglia and

Mansukani to the Board, thereby allowing them to continue breaching their fiduciary duties to Agilon. For these reasons, Defendant Sachdev breached his fiduciary duties, faces a substantial likelihood of liability, is not independent nor disinterested, and thus demand upon him is futile and, therefore, excused.

130.    Additional reasons that demand on Defendant Williams is futile follow. Defendant Williams is the Company's co-founder, and has served as the Executive Chairman of the Board since July 29, 2025. Previously, Defendant Williams served as the non-executive Chairman of the Board from 2017 to July 29, 2025. Thus, as the Company admits, Defendant Williams is a non-independent director. Defendant Williams has received and continues to receive compensation for his role as a director. As a trusted Company director, he conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Williams solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Battaglia and Mansukani to the Board, thereby allowing them to continue breaching their fiduciary duties to Agilon. For these reasons, Defendant Williams breached his fiduciary duties, faces a substantial likelihood of liability, is not independent nor disinterested, and thus demand upon him is futile and, therefore, excused.

131.    Additional reasons that demand on Defendant Wulf is futile follow. Defendant Wulf has served as a Company director since 2017. Defendant Wulf also currently serves as the Chair of the Compliance and Quality Committee, as a member of the Audit Committee, and as a member of the Nominating & Governance Committee. Defendant Wulf has received and continues to receive compensation for his role as a director. As a trusted Company director, he conducted

little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Wulf solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Battaglia and Mansukani to the Board, thereby allowing them to continue breaching their fiduciary duties to Agilon. For these reasons, Defendant Wulf breached his fiduciary duties, faces a substantial likelihood of liability, is not independent nor disinterested, and thus demand upon him is futile and, therefore, excused.

132.     Additional reasons that demand on the Board is futile follow.

133.     Defendants McLoughlin (as Chair), McKenzie, and Wulf served as members of the Audit Committee during the Relevant Period. In violation of the Audit Committee Charter, Defendants McLoughlin, McKenzie, and Wulf failed to adequately review and discuss the Company's earnings press releases, failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures. Thus, Defendants McLoughlin, McKenzie, and Wulf breached their fiduciary duties, are not disinterested, and demand is excused as to them.

134.     In violation of the Code of Conduct, the Director Defendants engaged in or permitted the schemes to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual

Defendants violated the Code of Conduct by failing to act with integrity; failing to avoid conflicts of interest; failing to ensure the Company's disclosures were accurate; failing to ensure the Company complied with applicable laws, rules, and regulations; and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

135.    Agilon has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Agilon any part of the damages Agilon suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

136.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

137.    The acts complained of herein constitute violations of fiduciary duties owed by Agilon's officers and directors, and these acts are incapable of ratification.

138.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate

funds, i.e., monies belonging to the stockholders of Agilon. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Agilon, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

139.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Agilon to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

140.    Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least four of the Director Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**
### **Against Defendants Sell, Battaglia, Mansukani, McKenzie, McLoughlin, Sachdev, Williams, and Wulf for Violations of Section 14(a) of the Exchange Act**

141.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

142.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate

commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

143.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

144.    Under the direction and watch of Defendants Sell, Battaglia, Mansukani, McKenzie, McLoughlin, Sachdev, Williams, and Wulf, the 2025 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

145.    The 2025 Proxy Statement was also materially misleading because it failed to disclose that: (1) the ability of the strategic actions to improve the Company's financial prospects was drastically overstated; (2) cost and risk controls implemented in 2024 would not begin to show a positive impact until 2026; (3) as a result of the foregoing, the Company's full year 2025 guidance was overstated and would not be achieved; and (4) the Company failed to maintain

internal controls. As a result of the foregoing, Defendants Sell, Battaglia, Mansukani, McKenzie, McLoughlin, Sachdev, Williams, and Wulf caused the Company's public statements to be materially false and misleading at all relevant times.

146.    Defendants Sell, Battaglia, Mansukani, McKenzie, McLoughlin, Sachdev, Williams, and Wulf knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the 2025 Proxy Statement, including but not limited to, the re-election of directors.

147.    The false and misleading elements of the 2025 Proxy Statement led Company shareholders voted to, *inter alia*: (1) re-elect Defendants Battaglia and Mansukani to the Board until the 2028 Annual Meeting of the Stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for the year ending December 31, 2025; and (3) on advisory basis, approve the compensation paid to the Company's named executive officers.

148.    The Company was damaged as a result of Defendants Sell's, Battaglia's, Mansukani's, McKenzie's, McLoughlin's, Sachdev's, Williams', and Wulf's material misrepresentations and omissions in the 2025 Proxy Statement.

149.    Plaintiff, on behalf of Agilon, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

150. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

151. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Agilon's business and affairs.

152. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

153. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Agilon.

154. In breach of their fiduciary duties owed to Agilon, the Individual Defendants willfully or recklessly caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the ability of the strategic actions to improve the Company's financial prospects was drastically overstated; (2) cost and risk controls implemented in 2024 would not begin to show a positive impact until 2026; (3) as a result of the foregoing, the Company's full year 2025 guidance was overstated and would not be achieved; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

155. The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

156.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate system of oversight, disclosure controls and procedures, and internal controls. Moreover, while the Company's stock price was artificially inflated as the result of the false and misleading statements alleged herein, two of the Individual Defendants engaged in lucrative insider sales, netting combined proceeds of approximately $363,676.

157.    The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

158.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

159.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

160.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Agilon has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

161.    Plaintiff, on behalf of Agilon, has no adequate remedy at law.

### THIRD CLAIM
**Against Individual Defendants for Unjust Enrichment**

162.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

163.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Agilon.

164.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Agilon that was tied to the performance or artificially inflated valuation of Agilon or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

165.    Plaintiff, as a shareholder and a representative of Agilon, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

166.    Plaintiff, on behalf of Agilon, has no adequate remedy at law.

### FOURTH CLAIM
**Against Individual Defendants for Abuse of Control**

167.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

168.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Agilon, for which they are legally responsible.

169.    As a direct and proximate result of the Individual Defendants' abuse of control, Agilon has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

170.    Plaintiff, on behalf of Agilon, has no adequate remedy at law.

## FIFTH CLAIM
### Against Individual Defendants for Gross Mismanagement

171.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

172.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Agilon in a manner consistent with the operations of a publicly held corporation.

173.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Agilon has sustained and will continue to sustain significant damages.

174.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

175.    Plaintiff, on behalf of Agilon, has no adequate remedy at law.

## SIXTH CLAIM
### Against Individual Defendants for Waste of Corporate Assets

176.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

177.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

178.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Agilon to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

179.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

180.    Plaintiff, on behalf of Agilon, has no adequate remedy at law.

## SEVENTH CLAIM
### Against Defendants Sell and Schwaneke for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

181.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

182.    Agilon, Defendant Sell, and Defendant Schwaneke are named as defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Sell's and Schwaneke's willful and/or reckless violations of their obligations as officers and/or directors of Agilon.

183.    Defendants Sell and Schwaneke, because of their positions of control and authority as officers and/or directors of Agilon, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Agilon, including the wrongful acts complained of herein and in the Securities Class Action.

184.    Accordingly, Defendants Sell and Schwaneke are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

185.    As such, Agilon is entitled to receive all appropriate contribution or indemnification from Defendants Sell and Schwaneke.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Agilon, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Agilon;

(c)    Determining and awarding to Agilon the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Agilon and the Individual Defendants to take all necessary actions to reform and improve Agilon's corporate governance and internal procedures to comply with applicable laws and to protect Agilon and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and

guidelines of the Board;

    2. a provision to permit the shareholders of Agilon to nominate at least four candidates for election to the board; and

    3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

    (e)    Awarding Agilon restitution from the Individual Defendants, and each of them;

    (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    (g)    Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: February 12, 2026               Respectfully Submitted,

                                         **THE BROWN LAW FIRM, P.C.**

                                         */s/ Timothy Brown*
                                         Timothy Brown
                                         Elizabeth Donohoe
                                         767 Third Avenue, Suite 2501
                                         New York, NY 10017
                                         Telephone: (516) 922-5427
                                         Facsimile: (516) 344-6204
                                         Email: tbrown@thebrownlawfirm.net
                                         Email: edonohoe@thebrownlawfirm.net

# **VERIFICATION**

I, Ravi Sinha, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 11th day of February, 2026.

Signed by:

Ravi Sinha